# EXHIBIT 5

# OUTSOURCE TRANSPORTATION SERVICES AGREEMENT

**THIS OUTSOURCE TRANSPORTATION SERVICES AGREEMENT** (this "Agreement") is made and entered into this 25 day of APRIL 2011 ("Effective Date"), by and between Toshiba International Corporation, with its principal place of business at 13131 West Little York Rd., Houston, TX 77041, hereinafter referred to as "Shipper", and C.H. Robinson Worldwide, Inc. and its affiliated broker subsidiaries with its principal place of business at 14701 Charlson Road, Eden Prairie, MN 55347, hereinafter referred to jointly and severally as "Broker". Shipper and Broker, as applicable, are hereinafter sometimes referred to individually as a "party" and collectively as "parties."

## WITNESSETH

**WHEREAS,** Broker is in the business of arranging the transportation and delivery of property by motor carriers and other modes of transportation and holds authority from the Federal Motor Carrier Safety Administration under Permit Number MC-131029 and other permits shown on the attached Exhibit 1, to engage in operations as a transportation broker of property for General Commodities (except Household Goods) in interstate or foreign commerce;

**WHEREAS,** Shipper is seeking an entity to which to outsource its transportation and delivery needs, including but not limited to the transportation and delivery of Shipper's freight to, from and between various points and places in intrastate, interstate and/or foreign commerce, within the U.S., Canada, Mexico, Asia, Europe, South America and Australia and desires to engage Broker to perform transportation brokerage services as described in this Agreement and Appendices attached hereto and made a part hereof;

**WHEREAS,** transportation and delivery services hereunder may include, without limitation thereto, the following categories: full truckload (including flatbed) ("FTL"), less than truckload ("LTL"), intermodal rail, ocean and air transportation ("Intermodal"), and over-dimensional international ocean freight shipments ("ODIS") and

**WHEREAS,** Broker desires to arrange for the transportation and delivery of Shipper's property by motor carriers (and, as agreed from time to time by the parties, other modes of transportation), to provide the transportation services outsourcing which Shipper desires, and Broker represents that Broker is fit, willing and able to perform such transportation services.

**NOW THEREFORE,** in consideration of the foregoing premises and the mutual promises contained herein, Broker and Shipper agree as follows:

1. **Term and Termination.** This Agreement shall remain in effect for an initial term of three (3) years beginning on Effective Date and ending on the third anniversary of the Effective Date (the "Initial Term"). Unless terminated as provided herein, this Agreement shall automatically renew for additional periods of one (1) year at the expiration of the Initial Term and every one (1) year anniversary thereof. Either party may terminate this Agreement at any time during or after the Initial Term upon giving the other party ninety (90) days' prior written notice of its intent to terminate. Notwithstanding the foregoing, this Agreement may be

terminated by the parties at any time during or after the Initial Terms due to the uncured breach of this Agreement by the other party and/or if both parties cannot mutually agree, after utilizing good faith, reasonable efforts to reach such mutual agreement, to changes in the rate schedule referred to in Article 7. In the event of a breach of this Agreement by either party (the "Breaching Party"), the other party (the "Nonbreaching Party), may provide Breaching Party with written notice of the claimed breach. Upon receipt of such written notice, Breaching Party shall have fifteen (15) days during which to cure such breach. If Breaching Party fails to cure the breach within such fifteen (15) day period, Nonbreaching Party may immediately terminate this Agreement thereafter by separate written notice of termination delivered to the Breaching Party. In the event Shipper terminates this Agreement prior to the end of the Initial Term for any reason other than Broker's non-cured breach or the failure of the parties to mutually agree, after utilizing good faith, reasonable efforts, to changes in the rate schedule referred to in Article 7, or if Broker terminates this Agreement prior to the end of the Initial Term due to Shipper's non-cured breach, Shipper shall pay Broker the Early Termination Fee set forth in Appendix A, Section 2. Termination of this Agreement shall not release either party from any liability to the other arising pursuant to this Agreement, whether or not such was ascertained at the time of termination.

2. **Outsource Transition; Tender of Shipments.** As set forth in Appendix A, Section 1, within fifteen (15) days of the Effective Date of this Agreement, Shipper and Broker shall in good faith begin to work together to create a mutually agreeable statement of work which will describe the efforts and systems associated with the transition of providing and/or arranging for transportation and delivery services hereunder, such services currently provided internally within Shipper but which will be outsourced to Broker, and shall complete the full integration of systems and implementation of the statement of work within ninety (90) days of the Effective Date (primarily dependent on the full cooperation of Shipper). Upon completion of such transportation outsource implementation and subject to Broker's ability to provide the services contemplated herein at reasonable costs and within reasonable timeframes, Shipper agrees to tender and/or cause to be tendered to Broker all transportation shipments made by Shipper's Motor Business Unit (for the purposes hereof, such shipments shall be referred to as "Shipper's shipments", "shipments" or "tendered shipments"). Notwithstanding anything contained herein to the contrary, nothing contained herein shall be construed to imply that all shipments made by Shipper must be tendered to Broker for shipment. Shipper agrees to issue written explanation and authorization to Broker, from Jay Bugbee, in the event Shipper's Motor Business Unit chooses to utilize another service provider for the above defined "Shipper's shipments", "shipments" or "tendered shipments". Upon receipt of Shipper's tenders, Broker will arrange for the transportation of all such shipments and/or customer arranged or supplier arranged shipments (a portion of the transportation of which may be by FTL, LTL or Intermodal). Broker agrees to accept all such tendered shipments and to arrange for their transportation and delivery in accordance with this Agreement.

3. **Services**

   3.1 **North American Brokerage Services.** Broker agrees to arrange for the pick-up, transport, and delivery of the shipments, as Shipper may reasonably request, exclusively by motor carriers and other Intermodal carriers, as applicable, that hold the proper

74055-6
CHR 59

government authority, equipment and insurance to perform the requested services. In arranging FTL, LTL, and Intermodal transportation and delivery services for Shipper pursuant to this Agreement, Broker shall not be responsible for packaging, handling or loading of shipments which shall instead be the responsibility of Shipper. Unless otherwise agreed in writing by the parties, every shipment handled by Broker for or on behalf of Shipper while this Agreement is in effect will be deemed tendered to Broker under this Agreement. Broker has the right to select the carriers used to perform the transportation services, subject to Shipper's right to timely reject the selection of any particular carrier as being unacceptable, and Broker is authorized to make the necessary FTL and Intermodal transportation and delivery arrangements with regard to Shipper's property that has been tendered to Broker. In performing brokerage services for Shipper, Broker shall only select carriers that meet the following criteria:

A.     **FMCSA Authority.** Carriers selected by Broker shall maintain proper authority from the Federal Motor Carrier Safety Administration ("FMCSA") and any applicable state agency to perform transportation services in intrastate, interstate and/or foreign commerce.

B.     **Safety.** Broker will only select carriers that maintain a safety rating from the U.S. Department of Transportation that is either "Satisfactory" or "Unrated" or "Conditional", and that agree to perform transportation of Shipper's shipments in compliance with all applicable safety laws and requirements.

C.     **Insurance.** Broker and Carriers selected by Broker for North American Brokerage Services, excluding Mexico shall maintain insurance of the kind and in the amounts set forth in Article 13 hereof.

D.     **Carriers' Equipment.** Carriers selected by Broker shall be required to provide equipment that is clean, safe, properly maintained, and hazard free, and that meets all applicable governmental regulatory standards and requirements. Carriers selected by Broker shall also be required to provide equipment that is sufficient in quality and quantity to meet Shipper's transportation needs as are or may be contemplated by this Agreement.

E.     **Carriers' Drivers.** Carriers selected by Broker shall be required to furnish drivers and other operating personnel who are fully qualified, licensed, trained, and experienced to properly and safely handle and transport Shipper's property.

F.     **Shipment Schedules.** Carriers selected by Broker shall be required to perform timely and reliable pick-up and delivery of all shipments in accordance with reasonable schedules communicated in writing (including by facsimile transmission and electronic mail) by Shipper, its vendors, suppliers and customers to Broker, and or Broker's arranged carriers providing the actual, physical transportation of such shipments.

3.2     **Ocean Transportation**

74055-6
CHR 60

A.    **Schedule, Rates And Payloads**. Upon Shipper's request, Broker shall arrange to transport certain freight tendered to Broker by Shipper for ocean transportation, as designated by Shipper. Shipper shall pay to Broker, net in U.S. Dollars, the charges, rates and fees mutually agreed between Broker and Shipper for all ocean freight cargo Broker arranges for Shipper during the term of this Agreement. This Agreement does not guarantee any net Cargo capacity per vessel.

B.    **Ocean Freight Equipment**. Ocean freight carriers selected by Broker shall be required to provide equipment that is clean, safe, properly maintained, and hazard free, and that meets all applicable governmental agency and or port authority regulatory standards and requirements, including the Federal Maritime Commission standards and requirements.

C.    **Insurance**. Neither Broker nor the arranged ocean freight carrier shall have any obligation to insure any Shipper freight transported via ocean vessel. Broker and the arranged ocean freight carriers shall only be required to provide insurance for Shipper's ocean freight shipments if expressly agreed upon in writing between Shipper and Broker.

D.    **Contraband/ X-Ray/Customs Clearance**. Shipper hereby warrants that it will use good faith and its commercially reasonable efforts to comply with industry standards and procedures approved by United States Customs, to ensure that the cargo to be transported by Broker pursuant to this Agreement is free of contraband. Neither Shipper nor Broker shall knowingly transport cargo which contains any contraband, un-manifested cargo or any materials, products, or other substances of which importation, possession, transportation, or distribution would constitute a violation of any law of the United States of America or any other governmental authority having jurisdiction over the ocean vessel. Broker, acting in the capacity of a customs broker, and/or as the Non-Vessel Operating Common Carrier (NVOCC), warrants that it is C-TPAT certified and complies with C-TPAT minimum security criteria as established by US Customs. Broker shall arrange transport and services with carriers that comply with C-TPAT minimum security criteria as established by US Customs.

E.    **Cargo Claims**. All cargo loss and/or damage claims connected to an ocean movement (to and from the United States) shall be administered in accordance with Carriage of Goods by Sea Act (COGSA) 46 U.S.C. § 1300 et seq. For all other international ocean freight movements, Broker's liability shall be governed by the Hague Rules as contained in the International Convention for the unification of certain rules relating to bills of lading, or by the Hague-Visby Rules respectively. Neither Broker nor the arranged ocean freight carrier shall be liable for any destruction, loss, or damage to cargo if such destruction, loss, or damage is proven to have resulted from an inherent defect, quality, and/or the nature of the cargo. Broker and the arranged ocean freight carrier disclaim any liability for cargo which may deteriorate or perish due to change in climate, temperature, or other ordinary exposure, or because of length of time in transit. Other specific limitations of liability set forth in this Agreement relevant to loss, damage, or delay of ocean freight are applicable.

74055-6
CHR 61

### 3.3 Air Transportation

A.    **Schedule, Rates And Payloads.** Upon Shipper's request, Broker shall arrange to transport certain freight tendered to Broker by Shipper for air transportation, as designated by Shipper. Shipper shall pay to Broker, net in U.S. Dollars, the charges, rates and fees mutually agreed between Shipper and Broker for all airfreight cargo Broker arranges for Shipper during the term of this Agreement. This Agreement does not guarantee any net Payload capacity per flight. Broker may, at all times during the term of this Agreement, impose a fuel surcharge on all charges hereunder, provided that the amount charged to Shipper shall be limited to the amount actually paid or incurred by Broker hereunder, and any refund or rebate of all or any portion of such surcharge received by Broker shall be promptly remitted to Shipper.

B.    **Airfreight Equipment.** Airfreight carriers selected by Broker shall be required to provide equipment that is clean, safe, properly maintained, and hazard free, and that meets all applicable governmental regulatory standards and requirements. Airfreight carriers selected by Broker shall also be required to provide equipment that is sufficient in quality and quantity to meet Shipper's transportation needs such as are or may be contemplated by this Agreement.

C.    **Insurance.** Neither Broker nor the arranged airfreight carrier shall have any obligation to insure any Shipper freight transported via air. Broker and the arranged airfreight carriers shall only be required to provide insurance for Shipper airfreight shipments if expressly agreed upon in writing between Shipper and Broker.

D.    **Contraband/ X-Ray/Customs Clearance.** Shipper hereby agrees to act at all times in good faith and to use commercially reasonable efforts to comply with industry standards and procedures approved by United States Customs, to ensure that the cargo to be transported by Broker pursuant to this Agreement is free of contraband. Neither Shipper or Broker shall knowingly transport cargo which contains any contraband, un-manifested cargo or any materials, products, or other substances that of which importation, possession, transportation, or distribution would constitute a violation of any law of the United States of America or any other governmental authority having jurisdiction over the aircraft or operations hereunder.

E.    **Cargo Claims.** If due to the acts or omissions of Broker or the arranged airfreight carrier, or any handling agent contracted by Broker or the arranged airfreight carrier, any cargo is allegedly damaged or lost, and claims as a result thereof are lodged against Broker or the arranged airfreight carrier, or their respective insurers, Broker will identify and analyze such claims in conformance with the Warsaw Convention limitations. However, Broker's arranged airfreight carrier shall not be liable for any alleged damage that occurs to cargo while it is not involved in "transportation by air" in accordance with the Warsaw Convention. Broker and/or the arranged airfreight carrier's limit of liability shall be established in accordance with the provisions of the Warsaw Convention. In the event that Shipper has reason to lodge a loss or damage claim, Broker must be notified of such intent no later than seventy-two (72) hours after arrival of the

74055-6
CHR 62

respective flight at all airports. Notification must be made by telephone or by electronic mail and followed up with a facsimile. An independent third party surveyor will be assigned to assess cause and extent of damage. Neither Broker nor the arranged airfreight carrier shall be liable for any destruction, loss, or damage to cargo if such destruction, loss, or damage is proven to have resulted from an inherent defect, quality, and/or the nature of the cargo. Broker and the arranged airfreight carrier disclaim any liability for cargo which may deteriorate or perish due to change in climate, temperature, altitude or other ordinary exposure, or because of length of time in transit. Other specific limitations of liability set forth in this Agreement relevant to loss, damage, or delay of airfreight are applicable.

**3.4    Over Dimensional International Ocean Freight Shipments.** Service parameters and the obligations of Broker for these freight movements have been outlined in the attached Appendix D.

4.    **Performance of Services.** Broker will arrange the dispatch and transport of all shipments tendered to it by Shipper promptly upon tender of same by Shipper. Broker will provide Shipper with prompt notification by telephone or electronic communication when this obligation cannot be met for any reason. Broker will communicate to each carrier that it engages to transport and deliver Shipper's shipments any schedule for delivery provided by Shipper for a particular shipment. Notwithstanding anything contained herein to the contrary, all services provided by Broker hereunder shall be provided in accordance with the then current process maps or other operating procedures or documents developed by Broker and Shipper in connection with this Agreement. Broker and Shipper agree that current process maps and other established operating procedures or documents are subject to ongoing adjustment and revision by the mutual cooperation and agreement of the parties.

5.    **Independent Contractor.** Broker's relationship to Shipper is that of an independent contractor, not an agent or employee, and nothing in this Agreement shall be construed as establishing an employment relationship, partnership, or joint venture between the parties. Subject to specific transportation services requested by Shipper, Broker shall make arrangements it reasonably deems appropriate for the transportation of shipments tendered by Shipper under this Agreement. Shipper is not and will not be responsible for any debts or obligations incurred by Broker in the performance of its business. Neither party shall be liable for any obligation incurred by the other, except as is expressly provided in this Agreement.

6.    **Compliance with Law.** Broker shall comply with all laws, rules and regulations of any duly constituted governmental authority applicable to its performance of the transportation services to be rendered pursuant to this Agreement. Broker will be solely responsible for any acts, omissions, and/or violations by its employees and will indemnify, defend and save Shipper harmless from any fine, penalty or liability that may result from such acts, omissions or violations; provided, however, that Broker shall not be responsible for any wrongful or negligent acts, omissions, or violations by Shipper, its vendors, customers, agents or employees (other than any liability imputed to Shipper as a consequence of any act or omission of Broker hereunder).

**74055-6**
**CHR 63**

7.   **Compensation to Broker.**  Unless otherwise set forth in Appendix A, Section 2, Shipper shall pay Broker the non-recurring one time fee set forth in Appendix A, Section 2 ("Initial Fixed Fee").  Additionally, compensation shall be paid by Shipper to Broker for all shipments tendered to Broker in the amounts or in accordance with the rate schedules set forth in Appendix B or such other rate schedules as are mutually agreed by the parties, which rate schedules may be amended in writing by the parties from time to time; provided, however, (a) that the parties hereto may at any time, agree, in writing, to change such compensation for any specific shipment or shipments, and (b) the rates may, upon the mutual written agreement of the parties, be changed if a material change in the laws or rules affecting Shipper's business, Broker's business, or transportation services in general create a hardship for either party, materially change the economic consequences of this Agreement, or make fulfillment of this Agreement reasonably impractical.  Broker and Shipper expressly agree to review annually, by mode and service line, the contract pricing applicable to such services.  The review shall begin no later than sixty (60) days prior to the end of each year of the term of this Agreement.  To facilitate such review, Broker shall provide documentation and information regarding the current year's transactions and any material changes in the applicable transportation industries, which shall serve as a basis for the price revision discussions.  Specific factors that will go into the rate review process may include but are not limited to: (i) available capacity in the marketplace, by mode; (ii) benchmarking of rates; (iii) driver supply and demand; (iv) freight characteristics; (v) type of service required; (vi) lead time of orders; (vii) manual or automation of order tender through carrier invoicing process; (viii) origin and destination locations and volumes; and (ix) Shipper's ability to secure better transportation rates independently.

8.   **Payment to Broker, Credit Terms.**  Shipper shall pay Broker the agreed compensation for each shipment tendered pursuant to this Agreement the later of (a) twenty-one (21) days from shipment ship date or if applicable, (b) twenty-one (21) days from a written amendment to Appendix B signed by both parties acknowledging a supplement or change in a rate or compensation, for any specific shipment or shipments (Appendix C), or, (c) twenty-one (21) days from Broker's date of invoice or statement.  Broker may change its credit terms with Shipper and may establish and/or revise a credit limit upon reasonable notice at any time when, Shipper's financial condition and/or payment record with Broker so warrant.

9.   **Receipts.**  Broker shall require each carrier it selects to transport Shipper's property to issue a bill of lading at origin evidencing receipt of each shipment tendered to it and shall obtain a receipt for delivery for each shipment from the consignee thereof or other party accepting delivery.  In the event of a conflict between this Agreement and a provision in the bill of lading, the provisions of this Agreement shall govern.

10.   **Carriers' Charges.**  Broker shall be solely and exclusively liable and responsible for the payment of rates and charges to carriers engaged by Broker that relate to the transportation of shipments tendered by Shipper to Broker pursuant to this Agreement.  Shipper's sole obligation with regard to the payment of transportation charges for services provided under or in relation to this Agreement is to pay Broker as required by Article 7 and Article 8 hereof.  Broker shall specifically provide in its contracts with the carriers that it utilizes to transport Shipper's freight that Broker will bill Shipper for transportation charges on the carriers' behalf and remit such

6000206v5

74055-6
CHR 64

proceeds to which such carriers may be entitled, but that all such carriers shall specifically agree that they will look solely to Broker, and not to Shipper, for the payment of their charges.

11.  **Cargo Liability.**

A.   **Claims.** If any shipment tendered to Broker pursuant to this Agreement suffers loss or damage, Shipper shall, as a condition precedent to any recovery or payment from Broker or a carrier arranged by Broker, submit, or cause to be submitted, to Broker a detailed claim, in writing, no longer than thirty (30) days after delivery, in the case of damage, and no longer than thirty (30) days after a reasonable time for delivery by the carrier has elapsed, in the case of loss or non-delivery. Broker will promptly forward all such claims to the responsible carrier. In the event that Shipper submits a claim to Broker, as set forth above, Broker shall use commercially reasonable efforts to arrange for the settlement of such claim by the carrier. In no event may Shipper withhold any payment due to Broker based upon a pending cargo claim, other than the individual freight payment related to the shipment which is associated with the pending cargo claim.

B.   **Liability Limits.** Unless Broker receives written notice from Shipper of a declared value in excess of $100,000 prior to the acceptance of the shipment by Broker, liability for any claim for loss or damage shall be limited to no more than $100,000.00 per truckload shipment. To the extent that multiple shipments are tendered by shipper at the same time and are transported at the same time and in the same vehicle, vessel, aircraft or train, such shall be considered an "individual shipment" for the purposes of this Section. There shall be a mutually agreed upon charge assessed by Broker for arranging the transportation of individual shipments or truckloads having a declared value in excess of $100,000 per shipment. In the event Shipper gives written notice of a declared value of in excess of $100,000 prior to the tender of a shipment, and Broker accepts such tender, the liability of Broker and Broker's arranged carrier shall be limited to the amount stated or declared in such written notice of valuation. With regard to ocean freight shipments, the liability for any claim for loss or damage shall be limited in accordance with the terms of the industry standard bill of lading (including the Christal Lines bill of lading, which is the NVOCC d/b/a entity for C.H. Robinson International, Inc.). With regard to domestic airfreight shipments, the liability for any claim for loss or damage shall be limited to no more than $0.50 per pound. With regard to international airfreight shipments, the liability for any claim for loss or damage shall be in conformance with the provisions of the Warsaw Convention and shall be limited to no more than $20.00 per kilo. With regard to intra-Canada shipments, the liability for any claim for loss or damage shall be limited to no more than $2.00 CAD per pound. For the avoidance of doubt, in all instances regardless of transportation mode or geographic region, unless Broker receives written notice from Shipper of a declared value in excess of $100,000 prior to the acceptance of the shipment by Broker, Broker's and/or the underlying arranged carrier's limitation of liability for loss or damage to cargo shall be no more than $100,000.

C.   **Broker Liability.**

74055-6
CHR 65

(a) The actual carrier arranged by Broker to transport Shipper's property shall have the primary liability to Shipper with respect to damages for loss or damage of or to any shipment tendered by Shipper pursuant to this Agreement. If the arranged carrier fails to pay Shipper its lawful damages for delay, loss or damage then, subject to Article 11.B hereof, Broker will undertake responsibility for payment of any such claim for damages as contemplated by 49 U.S.C. Section 14706, and shall have available to it all defenses available to a carrier under that statute and the case law construing that statute. Broker's responsibility shall not, under any circumstances, exceed the sum of $100,000.00 per FTL and LTL shipment for loss or damage, unless Broker receives written notice from Shipper of a declared value in excess of $100,000.00 prior to the acceptance of the shipment by Broker. LTL shipments are further subject to the current governing publications, the NMF-100 at the time of shipment and/or to any Rules Tariffs that are applicable to the engaged motor carrier. Shipper acknowledges and agrees that (i) rail carriers provide transportation services subject to provisions, restrictions and limitations in their Rail Circulars, and (2) the Rail Circulars address, among other matters, standards for loading, blocking and bracing, prohibitions and restrictions on certain types of commodities, limitations of liability, procedures and limitations on cargo claims, and requirements for proper descriptions of commodities, (3) applicable provisions of a rail carrier's Rail Circular in effect on the date of a shipment will apply, as between Shipper, Broker, the rail carrier and/or any other third party, to any shipment transported by such rail carrier, (4) the Rail Circulars are generally available through the rail carrier's website, and (5) persons and entities that use intermodal transportation by the rail carriers should be familiar and comply with the provisions, restrictions and limitations of the Rail Circulars. For shipments traveling within Mexico, Broker shall not be liable for any damage or loss to freight, unless such damage or loss is caused by the negligence or intentional misconduct of Broker. Shipper shall look directly to the underlying Mexican carrier for payment of loss or damage claims.

(b) With regard to ocean freight shipments, the liability for any claim for loss or damage shall be limited in accordance with the terms of the industry standard bill of lading (including the Christal Lines bill of lading, which is the NVOCC d/b/a entity for C.H. Robinson International, Inc.). With regard to domestic airfreight shipments, the liability for any claim for loss or damage shall be limited to no more than $0.50 per pound. With regard to international airfreight shipments, the liability for any claim for loss or damage shall be in conformance with the provisions of the Warsaw Convention and shall be limited to no more than $20.00 per kilo. With regard to intra-Canada shipments, the liability for any claim for loss or damage shall be limited to no more than $2.00 CAD per pound. For the avoidance of doubt, in all instances regardless of transportation mode or geographic region, unless otherwise agreed to between the parties in writing, Broker's and/or the underlying

6000206v5

74055-6
CHR 66

arranged carrier's limitation of liability for loss or damage to cargo shall be no more than $100,000.

(c) The acceptance of responsibility by Broker for payment of claims, subject to the limitations set forth in Article 11B. and 11C.(a), is expressly conditioned upon:

(i) The execution by Shipper of an assignment of all of its right, title and interest in and to any claim it may hold against the arranged carrier to Broker, together with a warranty that it is the owner of all right, title and interest in and to any such claim, that it has not sold, assigned or otherwise alienated any such claim or received any payment thereon, and that the amount claimed is true accurate and correct. This is a condition precedent to any obligation of Broker to pay Shipper on account of any cargo claim; and

(ii) A warranty that Shipper agrees to cooperate fully with Broker in the assertion and collection of any cargo claim, including but not limited to furnishing whatever documents and witnesses may be necessary, when and as necessary, to successfully prosecute a claim. The failure of Shipper to comply with this subpart shall be considered a critical, material breach of the terms of the assignment of any claim which shall require Shipper to immediately return to Broker all sums that Broker has paid to Shipper on account of such claim.

(d) Broker Liability During Storage of Freight. In all instances where Broker is providing Shipper with cross-dock warehousing services or if a shipment is unable to deliver, due to an act or omission of Shipper or any consignee or if any freight shipment is refused for any reason by Shipper or a consignee, Broker's liability for any claim for loss, damage, or delay shall cease to be that of a common carrier, and Broker's liability shall be that of a warehousemen.

D.    **Delay.** With respect to claims for delay, Broker shall only be bound to arrange, and the arranged carrier shall only be bound to transport, any shipment tendered by Shipper pursuant to this Agreement with reasonable dispatch, unless a specified delivery date and/or time for delivery is communicated to Broker prior to or in connection with the tender by Shipper of any individual shipment. "Reasonable dispatch" is the length of time that it would customarily and ordinarily take to transport a like shipment. As stated below, in no event shall Broker and/or the arranged carrier be liable to Shipper or any other party for any consequential damages and the parties agree it is not the intent of this provision to open Broker and/or the arranged carrier to any consequential damage liability.

12.    **Indemnification, Limitation of Liability.**

A.    **Indemnification.** Broker shall indemnify, defend and hold Shipper its officers, directors, and employees ("Shipper Indemnitee") harmless from and against any and all liabilities, damages, fines, penalties, costs, claims, demands and expenses (including

74055-6
CHR 67

costs of defense, settlement, and reasonable attorneys' fees), including damage or destruction of any property, or injury (including death) ("Claims") to any person, arising out of or related to: (i) any negligent or willful act or omission by Broker, (ii) any claims or actions by Broker's employees, (iii) the failure of Broker to comply with this Agreement, and/or (iv) any failure of any underlying motor carrier to maintain the types and amounts of insurance coverage required by this Agreement. Additionally, Broker shall contractually require the underlying motor carrier engaged by Broker to defend, indemnify and hold harmless Shipper Indemnitee from any and all Claims made by any person, arising out of or related to, directly or indirectly: (i) any act or omission by the underlying motor carrier and/or (ii) any claims or actions by the underlying motor carrier's employees; and (iii) any failure of any underlying motor carrier to maintain the types and amounts of insurance coverage required by this Agreement. The above obligations of indemnification shall not apply to, and specifically exclude, any Claims that arise or are associated with transportation services which are provided within Mexico, except to the extent such claims are arise out of the negligent or willful acts or omissions of Broker. Broker shall, upon request by Shipper in all instances where the underlying motor carrier engaged by Broker is providing Shipper Indemnitee with the primary indemnification, act as the representative of Shipper, as between the underlying motor carrier and Broker, and assist Shipper Indemnitee (as the primary direct contact with the underlying motor carrier) in the facilitation, administration and resolution of any claim related to the primary indemnification. Broker's and the underlying motor carrier's respective, foregoing indemnification and agreement to hold harmless obligations shall not extend to the amount of any loss, damage, claim, liability and/or injury resulting from the negligent or intentional wrongful acts or omissions of Shipper, its employees, subcontractors, or agents. Shipper shall indemnify, defend and hold Broker harmless from and against any and all liabilities, damages, fines, penalties, costs, claims, demands and expenses (including costs of defense, settlement, and reasonable attorneys' fees) arising out of damage or destruction of any property, or injury (including death) to any person, but only to the extent caused by the negligent or intentional wrongful acts or omissions of Shipper, its employees or agents (other than any liability imputed to Shipper as a consequence of any act or omission of Broker hereunder).

B. **Limitation of Liability. IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER PARTY FOR ANY PUNITIVE, INCIDENTAL, INDIRECT, OR CONSEQUENTIAL DAMAGES OF ANY KIND IN CONNECTION WITH THIS AGREEMENT, EVEN IF THE PARTY WHO IS LIABLE HAS BEEN INFORMED IN ADVANCE OF THE POSSIBILITY OF SUCH DAMAGES.**

13. **Insurance.** Broker agrees at all times to carry public liability and property damage insurance in the amount of One Million Dollars ($1,000,000) and cargo liability insurance in the amount equal to: (i) One Hundred Thousand Dollars ($100,000) per shipment, with an insurance company having an A.M. Best rating of A – or greater. Broker will promptly furnish Shipper with Certificates of Insurance or other acceptable evidence of coverage. Broker shall require all motor carriers to which it tenders Shipper's property to have and maintain auto liability, public liability and property damage insurance in the amount of Seven Hundred Fifty Thousand Dollars

($750,000) and cargo liability insurance in the amount equal to: (i) One Hundred Thousand Dollars ($100,000) per shipment. Broker agrees to maintain a complete and up to date file of all Certificates of Insurance evidencing the actual amount of auto liability, public liability, property damage, and cargo insurance policies of all motor carriers that it contracts with regarding transportation arranged for or on behalf of Shipper. Except as otherwise set forth in this Agreement, nothing in this Article shall in any way be construed as an acceptance by Broker, or the imposition upon Broker, of any liability of any kind or nature with respect to any shipment tendered by Shipper to Broker pursuant to this Agreement.

14.    **Hazardous Materials.**    Shipper shall not tender Broker any Hazardous Materials, as defined within 49 C.F.R., Subtitle B, Parts 105 through 180, for the purpose of having Broker arrange the transportation of such Hazardous Materials shipments, unless Shipper and Broker have executed a written amendment to this Agreement containing terms specifically relating to Hazardous Materials shipments ("Hazardous Materials Addendum").

15.    **Notices.**  Any notice, request, direction, instruction or other communication relating to the transactions contemplated by this Agreement shall be in writing, shall be sent postage prepaid, and shall be deemed to have been given when sent: (a) by certified mail, return receipt requested, two (2) business days after deposit for mailing, (b) by premium private courier or delivery service to the addresses recited herein above, one (1) business day after deposit for delivery, (c) by fax or telecopier, with proof of receipt by the intended recipient, (d) by email with proof of receipt by the intended recipient or (e) in such other manner or to such other address as shall have been designated by the party to which such notice, request, direction, instruction or other communication is to be given.

16.    **Force Majeure.** If either party is prevented from performing its obligations under this Agreement because of fire, earthquake, flood, explosion, accident not caused by such party or its agents, wind, water, strike, lockout, acts of terror, or any other cause that: (a) is wholly beyond the control of the party whose performance is affected, and (b) could not have been prevented or avoided by such party's exercise of diligence and care, then such party will be excused from the performance of all obligations of such party under this Agreement to the extent so affected for the duration of such specified circumstances.

17.    **Non-Disclosure of Information.**

A.  Broker and Shipper agree to keep confidential any information provided to it by the other party relating to that party's operations or business activities, including, but not limited to, the names of suppliers, carriers, vendors and customers. Each party agrees to hold all such information in confidence and shall not use any such information other than for the benefit of the other party or in performance of its obligations under this Agreement.

B.  Neither party shall disclose any information set forth in Section 17(A), nor shall either party disclose any information regarding this Agreement or any amendments or attachments hereto (collectively "Confidential Information"), except:
(a)  as may be required by law or regulation;

74055-6
CHR 69

(b) as is necessary to effect or further the purposes of this Agreement;

(c) when such disclosure is between a parent and its subsidiary or corporate affiliate; or

(d) when required in connection with an audit by an accounting or law firm, so long as the disclosing party is responsible for ensuring compliance with this confidentiality requirement by the audit or law firm.

The restriction against disclosure of Confidential Information as specified herein shall not apply to information which (i) was already known prior to the time it was imparted to the disclosing party by the other party, (ii) is available or becomes generally available to the public other than through a breach of this Section by the disclosing party, (iii) is acquired or received rightfully and without confidential limitation from a third party, or (iv) is independently developed without breach of this Section. If either party becomes legally required to disclose Confidential Information, or any part thereof, and such party is not permitted to make such disclosure as provided above in this paragraph, such party will give the other prompt notice of such requirement. If the non-disclosing party waives compliance with any of the terms of this Agreement or is unable to obtain a protective order or other appropriate remedy with respect to such disclosure of Confidential Information, then the disclosing party will disclose only that portion of the Confidential Information necessary to ensure compliance with such legal requirement.

18.    **Counterparts.** This Agreement may be executed in one or more counterparts and each of such counterparts shall, for all purposes, be deemed to be an original, but all such counterparts shall together constitute but one and the same instrument.

19.    **Choice of Law; Jurisdiction and Venue.** This Agreement and related services are and shall be governed by and construed in accordance with the laws of the State of Illinois.

21.    **Assignment.** Except as expressly set forth within this Agreement, neither party may assign, voluntarily, by operation of law or otherwise, any rights or delegate any duties under this Agreement without the other party's prior written consent, which consent will not be unreasonably withheld, except in the case of a merger, acquisition or sale of all or substantially all of the assets of the party, subject to the successor entity expressly assuming the obligations of the assigning party. This Agreement will bind and inure to the benefit of the parties and their respective successors and permitted assigns.

22.    **Entire Agreement.** This Agreement cancels and supplants any and all other written or oral agreements and understandings for transportation or transportation related services between Broker and Shipper.

23.    **Headings.** Any headings or numbering of paragraphs or articles of this Agreement are for organizational convenience only and all terms and conditions of this Agreement are intended to take precedence over any such heading or numbering. If any part, term, paragraph or provision of this Agreement is found or declared to be invalid or unenforceable for any reason, the remainder of this Agreement shall remain in full force and effect.

74055-6
CHR 70

24.     **Waiver.**  The failure of a party to object to or take action with respect to any breach of any term of this Agreement by the other shall not be construed as a waiver of any rights hereunder by the non-objecting party, nor of any claims, past, present or future, for any breach of this Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first above written.

**Toshiba International Corporation**

*Shipper*

By: _Michael Ayres_

Title: _SR VP & GM_

Date: _4/25/2011_

**C.H. Robinson Worldwide, Inc.**
**for itself and on behalf of its affiliated broker subsidiaries**
*Broker*

By: _MDMBM_

Title: _Vice President_

Date: _3.2.11_

# APPENDIX A - OUTSOURCE TRANSITION

## 1. Outsource Integration

The scope of planning by which to transition Shipper's transportation services to an outsourced process provided by Broker ("Integration") will be formally established by mutually agreement upon award of business. The parties will mutually develop and agree to a written statement of work which will identify the full scope of Integration services. Based on the parties' initial understanding of scope, the reasonable and achievable number of hours estimated for integration completion is listed below. If during the Integration, it is mutually determined that additional effort is required to complete a portion of the outsource implementation, Broker will produce and provide a change order, inclusive of all reasonable associated costs, including but not limited to travel and other expenses, to Shipper. No work will be begun by Broker and no charges will be incurred by Shipper until Broker and Shipper execute the mutually negotiated change order.

Initial Estimated Integration Hours:

| Stage | Hours |
|---|---|
| Stage One – Investigate | 63 |
| Stage Two – Innovate | 40 |
| Stage Three – Integrate | 69 |
| Stage Four – Improve | 10 |
| Site Visits – 3 @ 8hrs | 24 |

## 2. Initial Fixed Fee Waived; Early Termination Fee

Broker's Initial Fixed Fee related to providing the Process Transformation services is forty two thousand three hundred forty dollars ($42,340). Provided Shipper does not terminate the Agreement during the Initial Term (excluding a termination by Shipper due to Broker's uncured breach or the failure of the parties to mutually agree, after utilizing good faith, reasonable efforts, to changes in the rate schedule referred to in Article 7, Broker agrees to waive the Initial Fixed Fee associated with providing the Process Transformation services. Shipper and Broker expressly agree that if Shipper terminates the Agreement at any time during the first annual period of the Initial Term for any reason other than a termination by Shipper due to Broker's uncured breach or the failure of the parties to mutually agree, after utilizing good faith, reasonable efforts, to changes in the rate schedule referred to in Article 7, or if Broker terminates this Agreement due to Shipper's uncured breach, Shipper agrees to pay Broker an early termination fee (and expressly not as a penalty) as set forth in the following sentence. Shipper shall pay Broker an early termination fee of forty two thousand three hundred forty dollars $42,340, pro-rated equally over the remaining months of the Initial Term (i.e. if Shipper terminates early in the eighth (8th) month of the Initial Term, Shipper would pay Broker an early termination fee of $32,931.11; in the sixteenth (16th) month of the Initial Term, $23,122.22; etc.) Shipper agrees to pay Broker any accruing Early Termination Fee within fifteen days of the occurrence of any Early Termination.

**Toshiba International Corporation**
*Shipper*

By: _Michael Ayers_

Print Name: _MICHAEL AYERS_

Title: _SR VP & GM_

**C.H. Robinson Worldwide, Inc.**
**for itself and on behalf of its affiliated broker subsidiaries**
*Broker*

By: _MDuBois_

Print Name: _Molly DuBois_

Title: _Vice President_

## APPENDIX B – RATE SCHEDULES

Broker and Shipper agree that the rates, fees and charges set forth in this Appendix B shall apply, unless otherwise revised and/or extended in accordance with the terms of the Agreement.

**Truckload Rate Schedule – See Attached**
**Less than Truckload Rate Schedule**
**Railroad Rate Schedule – N/A**
**Ocean Rate Schedule – See Attached**
**Air Rate Schedule – NA**



Toshiba Rate
Schedule 021011.xls

**Toshiba International Corporation**
*Shipper*

By: ~~Michael Ayers~~

Title: ~~SR VP & GM~~

**C.H. Robinson Worldwide, Inc.**
**for itself and on behalf of its affiliated broker subsidiaries**
*Broker*

By: ~~MDuBn~~

Title: ~~Vice President~~

APPENDIX C
SUPPLEMENT OR CHANGE IN RATE
FOR TRANSPORTATION SERVICES
FOR SHIPMENT(S) SPECIFIED BELOW
[EXAMPLE ONLY]

| | |
|---|---|
| Shipper | Date |
| Bill of Lading or Freight Bill No. | Weight |
| Consignor (Origin) | Consignee (Destination) |
| Commodity | Commodity |
| Assigned rate or charge | Additional Charges (Describe) |

APPROVED _____ *(date)*


**Toshiba International Corporation**
*Shipper*

By: *Michael Ayus*

Title: *SR VP & GM*

**C.H. Robinson Worldwide, Inc.**
**for itself and on behalf of its affiliated broker**
**subsidiaries**
*Broker*

By: _____

Title: _____

74055-6
CHR 74

## APPENDIX D
## Over Dimensional Ocean Freight Shipment Services

From time to time, Shipper may request that Broker arrange for the transportation of certain over dimensional international freight shipments ("ODIS"). Broker, when providing ODIS services, shall provide them through its wholly owned subsidiary, Transera, an entity specializing in the international shipment of large equipment and project freight. The parties will agree upon the services that may be required to complete the ODIS, as well as the associated freight and service charges for each ODIS, which agreed upon freight and service charges shall be finalized in a Broker issued quote inquiry upon Broker's acceptance of such ODIS. Depending on Shipper's requirements for each ODIS, the ODIS services may include the following:

- Marine Surveyors
- Export Packaging
- Container Loading
- Container Purchases
- Cranes Hire / Mobilization / Demobilization
- Local Pickup or Delivery
- Receiving and Inspection
- Inland Transportation (Rail, Barge or Truck) in Country of Origin and / or Destination
- Permits / Wire Lifting etc.
- Terminal / Port Charges
- Air Freight (regular, high priority & charter)
- Ocean Freight (liner service, part charter, full charter)
- Marshalling
- Certification / Legalization
- Demurrage / Detention
- On-site supervision

Shipper acknowledges and agrees that a $100,000 USD limitation of cargo liability, applies to Broker (and its subcontracted carriers and service providers) on all ODIS. This limit applies regardless of whether Shipper identifies a higher ODIS cargo value to Broker at the time of tender. Broker strongly recommends that all ODIS with an actual valued in excess of $100,000 be insured through Transera nominated marine insurance provider with additional premiums, calculated on 110% of CIF (Cost, Insurance & Freight) value, to apply on a per shipment basis. Services such as duty, taxes, VAT, customs, or others requested outside normal quotation would be forwarded to Shipper for acceptance, in writing, prior to commitment of performance

Broker's ODIS responsibilities include:

- Overall project planning and coordination with respect to transportation and selection of carriers and subcontractors.
- Preparation of all necessary documentation as required and specified by Shipper.
- Preparation of bills of lading for each mode of transportation, dock receipts and bill of lading instructions.
- Negotiation, evaluation, selection and executing agreements with all carriers of every mode of transport and suppliers of transport related items. This may involve agents, crating/export packaging, trucking, rail, barge, ocean vessel, airline or charter aircraft, and handling at origin or destination.
- Home office coordination of all modes of transport and services in Houston, TX.
- On-site coordination of transportation at points of loading and unloading as required.
- Arrange marshaling of cargo at ports of loading and destination, as required.
- Coordination and securing of marine surveyor services as requested or required.
- Preparation of current status reports on progress of materials list and shipments. As well, meetings between key personnel at Transera and Shipper will be arranged on a regular scheduled basis, or as required.
- Arrange and coordinate all miscellaneous shipments from domestic and worldwide suppliers.
- Tracing shipments from point of purchase order up to point of final delivery.

74055-6
CHR 75

Exhibit 1

**U.S. Department of Transportation**
*Federal Motor Carrier Safety Administration*

400 7th Street SW
Washington, DC 20590

*SERVICE DATE*

June 24, 2002

## DECISION
MC-131029

ROBINSON TRANSPORTATION SERVICES

EDEN PRAIRIE, MN

**REENTITLED**

**C.H. ROBINSON COMPANY**
D/B/A C.H. ROBINSON WORLDWIDE

On June 18, 2002, applicant filed a request to have the Federal Motor Carrier Safety Administration's records changed to reflect a name change.

*It is ordered:*
The Federal Motor Carrier Safety Administration's records are amended to reflect the carrier's name as C. H. ROBINSON COMPANY, DBA C.H. ROBINSON WORLDWIDE.

Within 30 days after this decision is served, the applicant must establish that it is in full compliance with the statute and the insurance regulations by having amended filings on prescribed FMCSA forms (BMC91 or 91X or 82 for bodily
injury and property damage liability, BMC 34 or 83 for cargo liability, or a BMC 84 or 85 for property broker security and BOC-3 for designation of agents upon whom process may be served) submitted on its behalf. Copies of Form MCS-90 or other "certificates of insurance" are not acceptable evidence of insurance compliance. Insurance and BOC-3 filings should be sent to Federal Motor Carrier Safety Administration, 400 7th Street SW, Washington, DC 20590.

The applicant is notified that failure to comply with the terms of this decision shall result in revocation of its operating rights registration, effective 30 days from the service date of this decision.

To verify that the applicant is in full compliance, call (202)358-7000 or visit our web site at: http://lfmcsa-li.volpe.dot.gov. Any other questions regarding the action taken should be directed to (202)358-7028/7029.

*Decided:* June 19, 2002
By the Federal Motor Carrier Safety Administration

Terry Shelton, Director
Office of Data Analysis & Information Systems
NCA



## C.H. ROBINSON
### WORLDWIDE, INC.

*Toshiba Texas Matrix*                    **FLATBED -TX**

| Origin State | Destination State | Rate Per Mile |
|---|---|---|
| Texas | Alabama | $1.30 |
| Texas | Arizona | $1.45 |
| Texas | Arkansas | $1.60 |
| Texas | Northern California | $1.45 |
| Texas | Southern California | $1.40 |
| Texas | Colorado | $1.75 |
| Texas | Connecticut | $1.60 |
| Texas | Delaware | $1.45 |
| Texas | Northern Florida | $1.46 |
| Texas | Southern Florida | $1.65 |
| Texas | Northern Georgia | $1.30 |
| Texas | Southern Georgia | $1.35 |
| Texas | Idaho | $1.75 |
| Texas | Illinois | $1.25 |
| Texas | Indiana | $1.25 |
| Texas | Iowa | $1.48 |
| Texas | Kansas | $1.45 |
| Texas | Kentucky | $1.30 |
| Texas | Louisiana | 1.70/min $500 |
| Texas | Maine | $1.65 |
| Texas | Maryland | $1.46 |
| Texas | Massachusetts | $1.50 |
| Texas | Michigan | $1.35 |
| Texas | Michigan UP | $1.37 |
| Texas | Minnesota | $1.35 |
| Texas | Mississippi | $1.35 |
| Texas | Missouri | $1.45 |
| Texas | Montana | $1.80 |
| Texas | Nebraska | $1.60 |
| Texas | Nevada | $1.65 |
| Texas | New Hampshire | $1.60 |
| Texas | New Jersey | $1.46 |
| Texas | New Mexico | $1.80 |
| Texas | New York | $1.60 |
| Texas | New York (Island) | $1.65 |
| Texas | North Carolina | $1.30 |
| Texas | North Dakota | $1.65 |
| Texas | Ohio | $1.30 |
| Texas | Oklahoma | $1.70 |
| Texas | Oregon | $1.63 |
| Texas | Pennsylvania | $1.40 |
| Texas | Rhode Island | $1.60 |
| Texas | South Carolina | $1.30 |
| Texas | South Dakota | $1.65 |
| Texas | Tennessee | $1.35 |
| Texas | East Texas | 2.00/ $500 min |
| Texas | West Texas | 2.00/$600 min |
| Texas | Utah | $1.70 |
| Texas | Vermont | $1.60 |
| Texas | Virginia | $1.30 |
| Texas | Washington | $1.60 |
| Texas | West Virginia | $1.30 |
| Texas | Wisconsin | $1.35 |
| Texas | Wyoming | $1.70 |

*Rates based on 48 hours notice
**Rates do not include fuel surcharge
***Rates effective from 1/1/2011 through 3/31/2011
****Terms are net 30

Josh Landacre
Toshiba Account Executive
C.H. Robinson Worldwide, Inc.
Lexington, KY
866-605-6342



## C.H. ROBINSON
### WORLDWIDE, INC.

*Toshiba Texas Matrix*

| Origin State | Destination State | Rate Per Mile |
|---|---|---|
| Texas | Alabama | $1.20 |
| Texas | Arkansas | $1.60 |
| Texas | Arizona | $1.05 |
| Texas | California | $1.05 |
| Texas | Colorado | $1.35 |
| Texas | Connecticut | $1.80 |
| Texas | Delaware | $1.68 |
| Texas | Florida | $1.45 |
| Texas | Georgia | $1.16 |
| Texas | Idaho | $1.35 |
| Texas | Illinois | $1.10 |
| Texas | Indiana | $1.16 |
| Texas | Iowa | $1.15 |
| Texas | Kansas | $1.15 |
| Texas | Kentucky | $1.15 |
| Texas | Louisiana | $1.35 |
| Texas | Massachusetts | $1.70 |
| Texas | Maryland | $1.60 |
| Texas | Maine | $1.70 |
| Texas | Michigan | $1.20 |
| Texas | Minnesota | $1.10 |
| Texas | Missouri | $1.15 |
| Texas | Mississippi | $1.55 |
| Texas | Montana | $1.40 |
| Texas | Nebraska | $1.15 |
| Texas | New Hampshire | $1.70 |
| Texas | New Jersey | $1.80 |
| Texas | New Mexico | $1.65 |
| Texas | Nevada | $1.30 |
| Texas | North Carolina | $1.16 |
| Texas | North Dakota | $1.40 |
| Texas | New York | $1.65 |
| Texas | Ohio | $1.20 |
| Texas | Oklahoma | $1.75 |
| Texas | Oregon | $1.35 |
| Texas | Pennsylvania | $1.60 |
| Texas | Rhode Island | $1.60 |
| Texas | South Carolina | $1.16 |
| Texas | South Dakota | $1.35 |
| Texas | Tennessee | $1.10 |
| Texas | Texas | $1.95 |
| Texas | Utah | $1.35 |
| Texas | Vermont | $1.70 |
| Texas | Virginia | $1.40 |
| Texas | West Virginia | $1.60 |
| Texas | Washington | $1.35 |
| Texas | Washington DC | $1.60 |
| Texas | Wisconsin | $1.10 |
| Texas | Wyoming | $1.40 |

*Rates based on 48 hours notice
**Rates do not include fuel surcharge
***Rates effective from 1/1/2011 through 3/31/2011
****Terms are net 30
*****$500 Minimum

Josh Landacre
Toshiba Account Executive
C.H. Robinson Worldwide, Inc.
Lexington, KY
866-605-6342



**C.H. ROBINSON**
WORLDWIDE, INC.

*Toshiba Indiana Matrix*

| Origin State | Destination State | Rate Per Mile |
|---|---|---|
| Indiana | Alabama | $1.39 |
| Indiana | Arkansas | $1.43 |
| Indiana | Arizona | $1.18 |
| Indiana | California | $1.07 |
| Indiana | Colorado | $1.79 |
| Indiana | Connecticut | $2.14 |
| Indiana | Delaware | $2.14 |
| Indiana | Florida | $1.87 |
| Indiana | Georgia | $1.44 |
| Indiana | Idaho | $1.39 |
| Indiana | Illinois | $1.79 |
| Indiana | Indiana | $1.79 |
| Indiana | Iowa | $1.34 |
| Indiana | Kansas | $1.34 |
| Indiana | Kentucky | $1.84 |
| Indiana | Louisiana | $1.39 |
| Indiana | Massachusetts | $2.14 |
| Indiana | Maryland | $2.14 |
| Indiana | Maine | $2.14 |
| Indiana | Michigan | $1.84 |
| Indiana | Minnesota | $1.29 |
| Indiana | Missouri | $1.44 |
| Indiana | Mississippi | $1.39 |
| Indiana | Montana | $1.79 |
| Indiana | Nebraska | $1.29 |
| Indiana | New Hampshire | $2.14 |
| Indiana | New Jersey | $2.14 |
| Indiana | New Mexico | $1.44 |
| Indiana | Nevada | $1.29 |
| Indiana | North Carolina | $1.49 |
| Indiana | North Dakota | $1.34 |
| Indiana | New York | $2.20 |
| Indiana | Ohio | $2.09 |
| Indiana | Oklahoma | $1.44 |
| Indiana | Oregon | $1.24 |
| Indiana | Pennsylvania | $2.14 |
| Indiana | Rhode Island | $2.14 |
| Indiana | South Carolina | $1.44 |
| Indiana | South Dakota | $1.36 |
| Indiana | Tennessee | $1.49 |
| Indiana | Texas | $1.49 |
| Indiana | Utah | $1.34 |
| Indiana | Vermont | $2.14 |
| Indiana | Virginia | $2.14 |
| Indiana | West Virginia | $2.14 |
| Indiana | Washington | $1.24 |
| Indiana | Washington DC | $2.14 |
| Indiana | Wisconsin | $1.34 |
| Indiana | Wyoming | $1.79 |

*Rates based on 48 hours notice
**Rates do not include fuel surcharge
***Rates effective from 1/1/2011 through 3/31/2011
****Terms are net 30
*****$550 Minimum

Josh Landacre
Toshiba Account Executive
C.H. Robinson Worldwide, Inc.
Lexington, KY
866-605-6342

DocuSign Envelope ID: 2DB938EC-5B7B-4AA8-B94F-03B748084F85

# AMENDMENT NO. 2
# TO
# OUTSOURCE TRANSPORTATION SERVICES AGREEMENT

This Amendment No. 2 to Outsource Transportation Services Agreement (this "**Amendment**"), dated as of February 21, 2013, is made and entered into by and between Toshiba International Corporation, having its principal offices at 13131 West Little York Road, Houston, Texas 77041 ("**TIC**"), and C.H. Robinson Worldwide, Inc. and its affiliated broker subsidiaries, having its principal place of business at 14701 Charlson Road, Eden Prairie, Minnesota 55347 ("**Broker**"). Each of TIC and Broker may be individually referred to herein as a "**party**" or collectively referred to herein as the "**parties**".

## RECITALS:

**A.**     TIC and Broker have entered into that certain Outsource Transportation Services Agreement dated as of April 25, 2011, which Outsource Transportation Services Agreement was amended pursuant to that certain Amendment No. 1 to Outsource Transportation Services Agreement dated as of November 8, 2011 (together, the "**Services Agreement**").

**B.**     TIC and Broker desire to amend the Services Agreement as set forth herein.

## AGREEMENT:

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, TIC and Broker hereby agree as follows:

1.     **Amendments.**

        (a)     The Paragraph 2 of the Services Agreement shall be deleted in its entirety and replaced with the following:

         **Outsource Transition; Tender of Shipments.**  As set forth in Appendix A, Section 1, within fifteen (15) days of the Effective Date of this Agreement, Shipper and Broker shall in good faith begin to work together to create a mutually agreeable statement of work which will describe the efforts and systems associated with the transition of providing and/or arranging for transportation and delivery services hereunder, such services currently provided internally within Shipper but which will be outsourced to Broker, and shall complete the full integration of systems and implementation of the statement of work within ninety (90) days of the Effective Date (primarily dependent on the full cooperation of Shipper). Upon completion of such transportation outsource implementation and subject to Broker's ability to provide the services contemplated herein at reasonable costs and within reasonable timeframes, Shipper agrees to tender and/or cause to be tendered to Broker: (i) all USA/Canada outbound shipments tendered by Shipper's Adjustable Speed Drives Business Unit; and (ii) such other

DocuSign Envelope ID: 2DB938EC-5B7B-4AA6-B94F-03B748084F85

incoming or outgoing shipments as Shipper may designate from time to time (for the purposes hereof, such shipments shall be referred to as "Shipper's shipments", "shipments" or "tendered shipments"). Shipper agrees to issue written explanation and authorization to Broker from Mark Laber in the event Shipper's Adjustable Speed Drives Business Unit chooses to utilize another service provider for the above defined "Shipper's shipments", "shipments" or "tendered shipments". Notwithstanding anything contained herein to the contrary, nothing contained herein shall be construed to imply that all shipments made by Shipper must be tendered to Broker for shipment. Upon receipt of Shipper's tenders, Broker will arrange for the transportation of all such shipments and/or customer arranged or supplier arranged shipments (a portion of the transportation of which may be by FTL, LTL or Intermodal). Broker agrees to accept all such tendered shipments and to arrange for their transportation and delivery in accordance with this Agreement.

(b)     The Appendix B attached hereto shall be added to the Appendix B attached to the Services Agreement.

All other terms and conditions of the Services Agreement shall remain in full force and effect.

IN WITNESS WHEREOF, the undersigned have executed this Amendment as of the date first set forth above.

TOSHIBA INTERNATIONAL CORPORATION

By: _____
Name: _____
Title:     Sr. V&P and GM

C.H. ROBINSON WORLDWIDE, INC.

By: _____
Name: _____
Title:     General Manager